## Case No. 13,032.

### SMITH v. The CREOLE et al.

[4 Am. Law J. (N. S.) 558; 5 Pa. Law J. Rep. 186; 9 Leg. Int. 74.]

District Court, E. D. Pennsylvania. April 5, 1852.[1]

COLLISION IN HARBOR — PRESENCE OF PILOT—EFFECT OF COMPULSORY PILOT LAWS.

[1. A vessel having on board a licensed pilot, in compliance with a compulsory pilot law, such as the act of Pennsylvania of March 29, 1803, is not liable for a collision which happens through her fault while being navigated under his command. Not being selected by the voluntary act of the owners or master, his wrongful acts are not imputable to them, or to the vessel, on the ground of agency.]

[2. The Pennsylvania compulsory pilotage law of 1803 applies to foreign as well as American vessels.]

[3. Quære, whether a vessel may be liable in rem for a tort under circumstances which exclude any personal liability on the part of her owners.]

[This was a libel in rem against the ship Creole to recover damages alleged to have resulted from a collision.]

G. M. Wharton and R. R. Smith, for libellant.

Mr. Kane, for the Creole.
Mr. Sanderson, for the Sampson.

KANE, District Judge. The Creole, a British ship, outward bound, and in charge of a licensed pilot, left her moorings at one of the Delaware wharves, under tow of the steam tug Sampson, and immediately afterward ran afoul of the John Smith, a small steamer lying at the island opposite the city. The present libel is against both the Creole and the Sampson, for the damage which was occasioned by the collison. There was unquestionably fault on the part of one or both the respondent vessels, and there was none on the part of the libellant. The ship was drawn out from the dock while the tide was too strong for the steam tug to counteract it; besides which, as it seems to me, the operation of removing her was performed unskill-

---

[1] [Reversed in Case No. 13,033.]

fully; the ship being made to describe three-quarters of a circle, while under full tideway, instead of a single quadrant, before her head could get round to her course down the river. She had not completed this gyration when the collision took place. Regarding these, then, as the immediate causes of the accident, I should have no difficulty in decreeing for the libellant, as the party wronged, but for the fact that the real blame seems to me to rest upon the pilot alone. The ship and the steam tug were both of them under his orders, and there is no pretence that he was interfered with or disobeyed.

By an act of assembly of Pennsylvania, passed March 29, 1803 [4 Smith's Laws Pa. 73] provision is made (section 17) for the selection of pilots by the wardens of the port, and (section 18) for licensing the pilots so selected, after they shall have given bond with surety in a sum not exceeding five hundred dollars, nor less than three hundred, for the faithful performance of their duties. The 29th section of the same act makes it the duty of all sea-going vessels to employ one of the pilots so licensed. The language of the section, so far as it bears on the case before me, is as follows: "Every vessel, bound to a foreign port shall be obliged to receive a pilot; and the master shall make known to the wardens the name of the pilot who is to conduct her; and if he neglect to make such report, he shall forfeit and pay the sum of sixty dollars; and if the master shall refuse or neglect to take a pilot, the master, owner, or consignee of such vessel shall forfeit and pay to the wardens a sum equal to the half-pilotage of such vessel, to the use etc." By a supplement to this act, passed Feb. 24, 1820, the penalties I have recited are declared to be liens upon the vessel, and process in the nature of admiralty process is directed to issue from the state courts to enforce their payments. Though claims for half pilotage are thus put upon the same footing as the claims of material men against domestic ships in regard to which the United States courts have always felt themselves authorized to take jurisdiction of the statutory lien, I have not heretofore sanctioned the use of our admiralty process to collect them. So far as I know, the admiralty courts, like those of more general equity, have refused their aid to the enforcement of penalties, even such as were imposed by law for a breach of contract strictly within our cognizance. I have done so myself, under the passenger law, more than once, when this very ship, the Creole, or one of the same name, was the delinquent, and, if my memory serves me, in cases also under other acts of congress. And I have felt the less inclined to admit a departure from this principle in cases arising under the Pennsylvania pilot act, because I knew not only that the act itself was the subject of constant and grave controversy with reference to its effect on the navigating interests of our port, but also that

its constitutional validity had not been fully conceded among the members of the profession. I do not remember that, in any one of the numerous cases of collision that have been so ably discussed before me, there has ever been an inquiry whether there was or was not a pilot on board the offending ship.

Whether I shall be required hereafter to recognize the half pilotage lien as one to be enforced in the admiralty of this district, is a question not necessary to be considered now. But a recent decision of the supreme court of the United States (Jan. T., 1852), by declaring that the pilot acts are within the constitutional sphere of state legislation, has given great interest to the other question, whether the presence of a pilot on board and in command exonerates the vessel and cargo from liability for a collision. I cannot disguise from myself that this may be a momentous question, in its bearings on the safety of our bay and river navigation, and not remotely on the prosperity of our city. I fear that our whole system of pilot laws; the humble grade of qualification which it exacts of the candidates for pilot's license; the imperfect manner in which their qualifications are tested; the tenure of the pilot's office, independent of everything outside the board of wardens; the very limited security which he is required to give; and the compulsion which rests on the master of an inward-bound vessel to accept the first pilot that boards him,—all these, taken together, do not promise such a safeguard against collisions on our long and intricate river, or such an assured indemnity for the consequences of them, as to make us willing to forego, if we can help it, all recourse for a party aggrieved against the vessel that has run him down. I think, too, I can see that one class of vessels, which the policy of the admiralty has heretofore held to a most rigorous accountability, and which has been able, as a class, to respond more amply than any other for the damage it may have done, will hereafter find it politic, if it be practicable, to devolve its liabilities for collisions upon some licensed pilot and his three or five hundred dollar surety, to be sued at common law. The question, however, is not I apprehend, a new one, either in its principle or its terms. There can be no liability for collision where there has been no wrong. The foundation of the demand against the owner, in personam, or his vessel, in rem, is that he or his representative had the power to prevent the wrong. The master is the owner's representative, for the owner selects him, and substitutes him for himself, or does without him, if he pleases, and takes the command in person. "Qui facit per alium," etc., explains this liability very perfectly. But it has never been held that the ship owner should answer for the conduct of a prize master, or the piracies of a revolted crew—may, not even for their contracts, though made for the benefit of the ship,—

The Anne [Case No. 412],—and for the simple reason that there is no such thing as a representative in invitum, and no such thing as a liability for the acts of a stranger. The pilot, if it is the law that places him in the charge of a vessel, is as little the owner's representative, as the marshal is who holds her in possession under a writ of attachment.

Our only inquiry then is whether it is the law or the ship owner that puts the pilot on board? Is it a case of compulsion? or is it not? I confess I cannot see what discretion is left to the owner or his representative, save that which belongs to every man, of violating a law, and taking the consequences. If the Creole had not received a pilot, she would have incurred a penalty of sixty dollars, to begin with, for not reporting her pilot's name to the wardens, and a further penalty, to the use of the Pilot's Society, equal to half the charge for pilotage; and for these penalties she might have been arrested, brought back to the wharf, libelled, and sold. Besides, the words of the act are strong ones: "She shall be obliged to receive a pilot;" and a state court, having full criminal jurisdiction according to the common law, might, peradventure, hold that to violate an injunction like this, was to commit a misdemeanor. This looks very like compulsion.

If we pass from principles to authority, the question at the present day seems equally clear. The reports of some of the early cases do not distinguish as carefully as they might between the compulsory and the voluntary employment of a pilot, and the reasons which have sometimes been given in the common law courts might apply equally well to one or the other. Milligan v. Wedge. 12 Adol. & E. 742, and cases there cited. But I believe no judge, except Sir John Nicholl, in The Girolamo [3 Hagg. Adm. 169] and other cases in 3 Hagg. Adm., has ever held a party liable for the conduct of third persons whom the law compelled him to employ. The fully reasoned decisions of Dr. Lushington, in The Protector [1 W. Rob. Adm. 57]. The Maria [Id. 95], The Diana [Id. 131], and The Duke of Sussex [Id. 275], explained by himself in The Agricola [2 W. Rob. Adm. 10], The Batavia [Id. 407], The Eden [Id. 442], and other cases, in 2 W. Rob. Adm., must be regarded as fixing the law of the English admiralty on the subject. Where a pilot has been received on board in obedience to a statutory injunction, and the blame of a collision, occurring while he is in charge, is not shared by the officers or crew, and is not referable to the defective character of the vessel itself, the vessel and her owners are not responsible. Smith v. Condry, 1 How. 34. I thought at first, on reading over the adjudications of Sir John Nicholl, that there might be a reason for not applying the general rule to the particular case before me; and I invited, therefore, an argument upon the two questions:

1st. Whether the compulsory provisions of our pilot acts apply to foreign ships. 2nd. And whether there might not remain a recourse in rem, though the owners were discharged from personal liability. But I now see no reason for either of these exceptions. Whatever may have been the case under some of the British pilot laws, the words of which might, by reference to other statutes, be construed without too much effort, so as to exclude foreign vessels, the general English law makes no distinction; and in the Pennsylvania act, which makes part of our question, the phraseology is too clearly general to be misapprehended. Indeed the Pennsylvania act, so far from relieving foreign vessels from its operation, mulcts them in special liabilities. Acts Pa. 1803, p. 76, § 27. Obviously there is no reason of policy to found a distinction on between the two. When the act is considered as a police regulation to guard against accidents from collision, or as the means of providing vessels with guides to the navigation of the bay and river, familiar with its tides and channels and with the regulations and usages of the port, it should bear on all alike, for all alike derive benefit from it, and alike require to be controlled.

The other question also, though expressed in general terms, was in fact suggested by the proviso of British statute, which reserved to the admiralty its jurisdiction in cases of damage under the pilot system, while taking away in certain cases that of the courts of common law. It is enough to say that the question cannot arise on the language of the Pennsylvania act.

This last question might perhaps invite a discussion on the broader ground which was taken by the advocate for the Creole. What is the admiralty import of a proceeding in rem? And does it so connect itself with the question of a personal liability, as that the thing may be liable, although the owner is not, and never has been? I do not refer to the case of a hypothecation, actual or constructive, as there is a bottomry, or where the question is of affreightment, or supplies, or seamen's wages. All these belong to the category of contract. But how is it with the recourse in rem in a cause of damage by collision? The English books do not help us to answer. The standard treatise of old Clerke has not a word about collisions, or the redress for them, and not a word about proceedings in rem, except where the dispute concerns the title or right of possession in a ship. What we recognize as the process in rem would seem to have been introduced into the courts of admiralty after the time of Queen Elizabeth, and was probably resorted to at first as a means of saving some part of their ancient jurisdiction from the innovating grasp of the common law judges. It must have been known as early as 1648, when the ordinance of the commonwealth declared the admiralty jurisdiction to be against the vessel and her apparel in cases of damage among

others; but this ordinance having expired at the Restoration, in 1660, Godolphin, whose work was published ·the year afterwards, makes no allusion to this as a form of process. Godol. c. 4, p. 41. There is, properly speaking, no lien in a case of collision, and cannot be, for the subject is tort. Yet the remedy, according to the ancient and practically approved opinion in this district, is not affected by a change of property in the thing; no one has contended in this court that his vessel was free of liabilities for a collision because he had purchased her after it took place. Doctor Lushington almost asserted a doctrine like our own when he decided in The Aline, 1 W. Rob. Adm. 117, 119, that the decree in favor of the party damaged took precedence of a bottomry bond. But in The Druid, Id. 399, where the immediate question was brought to his notice more directly, he passed it by with the remark that an innocent purchaser may possibly have his ship arrested and sold for damages done by her before his purchase; and, generally speaking, the judicial opinions in the English admiralty, and the treatises which follow them. Lord Tenterden's among the rest, seem to regard the vessel and her owner as legally convertible terms. Still I cannot help thinking that there is a difference between them, and that the remedy in rem is not merely another mode of giving effect to a personal liability. I have myself endeavored to trace the analogies and history of this form and measure of redress through the Roman law and the maritime codes of a later period But the libraries to which I have access are so imperfect as to leave me uncertain of the correctness of my conclusions. For the present case it is enough to say, the vis major of the law must be esteemed as effective as any other in absolving both the ship and her owner; and that, therefore, whether the vessel can or cannot be regarded in any case as the subject of an independent liability, she can never be regarded as liable for the consequences of an act done under legal compulsion. I shall therefore dismiss the libel; but without costs. Decree accordingly.

[The cause was taken to the circuit court on an appeal, where the decree of this court was reversed. Case No. 13,033.]